Barbara S. Kirkland v. Commissioner. Betty Stoddard Horn v. Commissioner.
Kirkland v. Commissioner
Docket Nos. 107313, 107314.
United States Tax Court
1942 Tax Ct. Memo LEXIS 73; 1 T.C.M. (CCH) 109; T.C.M. (RIA) 42603; November 25, 1942
*73 (1) In the taxable year petitioners were the joint owners with their brother of several parcels of improved real estate located in Chicago and Pittsburgh. This real estate was rented and managed through the supervision of an office force which petitioners together with their brother maintained in New York City. Accounts were kept and disbursements were made from there. Held, that petitioners, in owning, managing and operating improved real estate from which they received considerable rental income, were engaged in carrying on business and the part of the office expenses properly allocated to this business is deductible as ordinary and necessary business expenses. Held, further, that the activities of petitioners' New York office in supervising petitioners' securities, stocks and bonds and notes, collecting dividends and interest, buying and selling securities for petitioners' own account, did not amount to carrying on a trade or business, and the office expenses attributable thereto are not deductible as ordinary and necessary business expenses. Held, further, such latter expenses are deductible as nontrade or nonbusiness expenses under section 12(a) (2), Revenue Act of 1942, made *74 retroactive by its terms. (2) In the latter part of the year 1937, petitioner Kirkland purchased a dairy farm which she stocked with some thoroughbred Jersey cows and operated during the remainder of the year at a considerable loss. The Commissioner disallowed the claimed loss on the ground petitioner had not substantiated that the dairy farm operation was one entered into for profit within the meaning of section 23(e). Held, petitioner acquired the dairy farm for the purpose of operating it at a profit and in the taxable year operated it for that purpose and is entitled to a deduction of the loss sustained in 1937. Geo. E. H. Goodner, Esq., Munsey Bldg., Washington, D.C., and Helen Goodner, Esq., for the petitioners. Henry C. Clark, Esq., for the respondent. BLACK Memorandum Findings of Fact and Opinion These proceedings have been consolidated. Docket No. 107313 involves a deficiency in income tax for the year 1937, which the Commissioner has determined against Barbara S. Kirkland. The deficiency is due to four adjustments made by the Commissioner to the net income of the taxpayer as disclosed by the income tax return which she filed for the taxable year. These adjustments were: *75 (a) Dividends
$1,750.00
(b) Worthless security
3,000.00
(c) Office expense
3,090.21
(d) Farm loss
1,784.80
Total
$9,625.01 There were two small adjustments which the Commissioner made in petitioner's favor which are not in controversy. The petitioner by appropriate assignments of error contests the correctness of adjustments (a), (c) and (d) shown above. No assignment of error was made as to the correctness of adjustment (b). In Docket No. 107314 the Commissioner determined a deficiency in income tax for the year 1937 against petitioner Betty Stoddard Horn of the sum of $1,819.04. This deficiency is based upon two adjustments made by the Commissioner in the income tax return filed by the petitioner for the taxable year. These adjustments were: (a) Dividends
$1,750.00
(b) Office expense
3,151.82
Total
$4,901.82
The Commissioner made one small adjustment in petitioner's favor, which is not in controversy. Petitioner by appropriate assignments of error contests the correctness of both adjustments (a) and (b) shown above. Petitioner Betty Stoddard Horn's assignments of error raise the same issues as are raised by Petitioner Barbara S. Kirkland with reference *76 to dividends and office expenses. The farm loss issue raised in Barbara S. Kirkland's case is not present in Betty Stoddard Horn's case. Findings of Fact The petitioners, Barbara S. Kirkland and Betty Stoddard Horn, are sisters and their principal office is at 1 East 57th Street, New York, New York. They filed their income tax returns for the calendar year 1937 with the Collector for the Third District of New York. In 1918 during their minority, petitioners and their brother, Louis E. Stoddard, Jr., (hereinafter referred to sometimes as "the Stoddard children") acquired by inheritance through their mother interests in two large estates, consisting of securities, real estate, and jewelry. Most of the real estate was located in Pittsburgh and Chicago. The father of the Stoddard children was appointed guardian of their estates during their minority. An ancillary guardian was appointed in Pennsylvania also, as required by the courts of that state, to manage the Pittsburgh real estate, and he was given the management of the Chicago properties also. The guardian, Louis E. Stoddard, Sr., maintained an office, first in New Haven, Connecticut, and later in New York City, for the purpose *77 of managing the properties of the Stoddard children. That office kept detailed accounts and records of all properties; managed all the securities and personal property; and directed and advised the ancillary guardian with regard to the handling of the real estate under his jurisdiction. The office kept the real estate books and received quarterly reports from the ancillary guardian from which it made the entries. The Stoddard children continued to maintain the New York office for the purpose of managing and looking after their properties after they reached their majority. They were all of age in 1937. In 1937 the Stoddard children maintained a three-room office at 1 East 57th Street, New York City. The office personnel consisted of a manager and two other employees who did the stenographic work and bookkeeping. The office manager was given authority to run the office and to handle all routine matters, but was required to submit important matters and questions of policy to the Stoddard children for decision. The Stoddard children met together on an average of about once a week in the office for the purpose of deciding questions of policy and instructing the office manager. They were *78 also either in the office or in touch with the office manager frequently at other times. The major activity of the office in 1937 was the handling and managing of the real estate in Pittsburgh and Chicago, owned by the petitioners and their brother. In addition to that acquired by inheritance they had acquired real estate by purchase and some by mortgage foreclosure. Most of the real estate was owned jointly by the three Stoddard children, but petitioner Kirkland and her brother owned some pieces in which petitioner Horn had no interest. In 1937 petitioner Kirkland owned an interest in 30 rental properties in Chicago and Pittsburgh, from which she received total net rentals of $20,420.89. Petitioner Horn owned an interest in 19 rental properties from which she received total net rentals of $16,275.60. The petitioners also owned interests in 9 unimproved pieces of real estate. The office was the central clearing house for all real estate income and expenses, leases, conferences with agents, repairs to buildings, etc. The office examined titles and records, made leases and sales, collected rents, authorized repairs and improvements, paid taxes and took mortgages. The Stoddards employed *79 real estate agents in both Pittsburgh and Chicago who collected and remitted the rents to the New York office, less their commissions. The net rentals above referred to were after the deduction of agents' commissions but before the deduction of other expenses, such as taxes, repairs and the office expenses here involved. The agents had no authority to do anything other than collect the rent and were required to submit all leases, credit ratings, repairs, mortgages, etc., to the New York office for authorization and approval. The office in New York managed the securities owned by the Stoddard children. The securities consisted of stocks, bonds, and notes, part of the mortgage notes were acquired through sale or foreclosure of properties. The securities were not owned jointly for the most part in 1937 and the amount of securities owned by each varied. The office made purchases and sales of stocks and bonds in 1937 for petitioners. The decision as to when and what security to buy or sell was made by petitioners. If one of the petitioners decided to purchase or sell a security, she notified the office and the office called the broker and put through the transaction. In 1937 petitioner *80 Kirkland sold 16 blocks of stocks and bonds in varying amounts for a total net price of $46,924.56. She also purchased securities in 1937. In 1937 petitioner Horn sold 33 blocks of stocks and bonds in varying amounts for a total net price of $177,141.90 and she also made purchases of securities (14 purchases shown on return). The office clipped the coupons on bonds, received the interest and dividends on notes and stocks, and recorded them in the books of the owner of that security. The securities required no further attention unless there was a sale or purchase, or a default in dividends or interest. There were no defaults in 1937. The office manager kept complete accounting records for the Stoddard children. She kept individual books for both petitioners and for Louis E. Stoddard, Jr.; a set of books for Stoddard Real Estate Properties; books for Louis E. Stoddard, Sr., and for petitioner Kirkland's Indian Hill Farm. All the books were on the cash basis. All transactions relative to real estate were entered in the Stoddard Real Estate Properties books, except the interest on mortgage notes, which was entered on the individual books. When an entry was made in the real estate *81 books, the income or expense was divided on the books among the Stoddard children in the proportion in which the particular property was owned. At the end of the year the total income and expenses applicable to real estate for each petitioner were transferred to her individual books of account. There was also a separate check book and bank account for Stoddard Real Estate Properties and any one of the three Stoddard children could sign checks on this account. The office manager had no authority to sign checks on any bank account of the Stoddard children. In 1937 the expenses of maintaining the office were entered on the real estate books and were paid from the real estate checking account. The expenses of maintaining the office were divided equally between petitioners and their brother, except where the property to which the expenses were applicable was not owned equally. There were small differences due to individual items in accounting, such as safety deposit boxes. In 1937 petitioner Kirkland's share of the office expenses was $3,090.21 and the share of petitioner Horn was $3,151.82. The expenses consisted of salaries, office rent, light, telephone, stationery, postage, safety *82 deposit boxes for notes, mortgages, leases, securities, and the like, and other miscellaneous office expenses. The major portion of the office expenses paid by each petitioner was salaries of $1,649.99 and rent of $500 and the balance was made up of the other items. In 1937, 90 percent of the total expenses of maintaining the joint office were applicable to managing the real estate and 10 percent to managing securities. In the management and operation of these large real estate properties owned in Chicago, Illinois, and Pittsburgh, Pennsylvania, by petitioners and their brother, they were carrying on a business within the meaning of section 23 (a), Revenue Act of 1936 and the 90 percent of the total expenses of conducting and maintaining the joint office constituted ordinary and necessary expenses in carrying on such business. The 10 percent of the office expenses above allocated to managing securities was a non-business expense but was expended for the production and collection of income or for the management, conservation and maintenance of property held for the production of income. Petitioners deducted their respective shares of the office expenses as a real estate expense on *83 their income tax returns for 1937. Respondent disallowed the deductions on the ground that they were not ordinary and necessary business expenses. Respondent has determined that each of the petitioners failed to report a dividend of $1,750 received by her from Peyton-duPont, Inc., in 1937. In each deficiency notice the Commissioner stated with reference to this item: (a) Information on file in this office indicates that you received a dividend in the amount of $1,750.00 from Peyton-duPont, Inc., 350 Madison Avenue, New York, New York. This dividend was not reported on your return and, therefore, is added to taxable income. Petitioners held 500 shares of Peyton-duPont, Inc., stock as collateral on a large loan due from John R. Hall, with the right to have any dividends forwarded directly to them. In 1937 they received the dividend of $7 per share on said stock and each petitioner entered one-half of the dividend on her books as interest received on the Hall loan. Each petitioner included her share of the dividend in the amount of $1,750 on her return for 1937 as an item of interest received. Respondent's determination that the amounts were not reported was erroneous. On October *84 1, 1937, petitioner Barbara S. Kirkland purchased a 206 acre dairy farm known as the "Indian Hill Farm", located near Brewster, New York. The farm buildings consisted of two small farm houses, dairy barns, bull pens, and other small buildings. Prior to buying the farm petitioner discussed cattle and dairy farming with John Ellsworth, head of the Thoroughbred Jersy Cattle Association, and with other persons. Ellsworth kept a large Jersey herd on his farm and also maintained a retail shop for dairy products in New York City. After talking with Ellsworth petitioner decided to go into the dairying business. She purchased the Indian Hill Farm for the purpose of engaging in the dairying business for profit. Petitioner immediately took possession of the farm and commenced to assemble a herd. She purchased only registered thoroughbred Jerseys and it took her some little time to buy her herd. She looked particularly for choice producing stock with a high butter fat production. She hired a manager and two helpers to assist him, who lived on the farm. Petitioner also spent some time at the farm in looking after it. In years subsequent to the year 1937, petitioner divided her acreage into farming *85 and pasture lands and used the farming land to grow feed for her cows, and in later years for her poultry. Petitioner did not have a home at the farm and did not live there, but she kept a room for her use in one of the tenant houses. While at the farm, she sometimes stayed in her room and sometimes in Brewster, the nearby town. Petitioner's books and income tax returns for Indian Hill Farm were kept and filed on the cash basis. The total receipts during 1937 from the sales of milk from the farm were $77.93. Petitioner attached a schedule, Form 1040F, to her income tax return for 1937 showing a net loss of $1,784.80 from farming operations during 1937. Petitioner included the milk sales of $77.93 as income on said schedule and took the following expenses as deductions: Salaries of manager and two tenant
farmers
$ 836.87
Feed, hay, and straw purchased
27.65
Insurance, covering two small farm
houses, dairy barns, bull pens, and
small buildings
203.97
Gas and electricity for barns and tenant
houses
46.68
Telephone for office in barn
17.54
Repairs to worn parts of silo, to ready
it for storage
143.83
Miscellaneous - shoeing horses and
other small items
134.79
Loss through death of horse
300.00
Depreciation on farm buildings and
machinery
151.40
Total
$1,862.73
*86 tSaid expenses and sales are a correct statement of the operation of the farm for 1937, except the loss through death of horse should be $275 instead of $300. When she purchased the farm, petitioner also bought from its former owner a team of fine horses for a price of $550. One of the horses ran into barbed wire, contracted tetanus, and died only a few days after she took possession of the farm. Petitioner thereby sustained a loss of $275 which represented the cost of the horse to her. On October 1, 1937, petitioner acquired her farm buildings at a cost of $10,000 and the machinery at a cost of $2,066.50. A reasonable future life from that date for the farm buildings was 21 years and for the farm machinery was 10 years. A reasonable allowance for depreciation on the buildings and machinery for 1937 is $151.40. Subsequent to 1937 petitioner's herd of Jerseys and six other herds in the neighborhood were stricken with a disease known as contagious abortion, due to contaminated water in the territory. The State of New York ordered that the infected herds be destroyed and petitioner was obliged to get rid of her cows. She then went into the poultry business and now sells more than *87 600 dozen eggs a month. She also raises turkeys. Opinion BLACK, J.: We will first take up the issue raised by petitioners' assignments of error contesting the action of the Commissioner in adding to each petitioner's income $1,730 as dividends received from Peyton-duPont, Inc. during the taxable year. The evidence shows that the Commissioner is clearly in error with respect to this adjustment. Petitioners did in fact each receive $1,710 as dividends from the Peyton-duPont, Inc. company. They were not, however, owners of the stock but were holding it as collateral security for a loan made by them to one John R. Hall. Upon receipt of the dividends they credited the amounts to the payment of interest which Hall owed petitioners. In their income tax returns each petitioner reported this $1,710 as interest received. It is not entirely clear just how the Commissioner fell into error with respect to these dividends. The Revenue Agent, who audited petitioners' returns for the year in question, testified that he did not recommend the addition to petitioners' income of this $1,710 dividends. Doubtless the error came about by reason of the Commissioner's having in his office information schedules *88 by the Peyton-duPont, Inc. company of dividends paid during the taxable year. At any rate the evidence in this proceeding clearly sustains the petitioners in this assignment of error. We so hold. The next issue which is common to both proceedings is the correctness of the Commissioner's action in disallowing to each petitioner the amounts of office expenses deducted on their income tax returns. We have given the facts with reference to this issue rather fully in our findings of fact and we deem it unnecessary to repeat them here. Suffice it to say that we think these facts show that in the management and operation of large real estate properties owned in Chicago, Illinois, and Pittsburgh, Pennsylvania, by petitioners, they were engaged in business. Cf. Eugene Higgins, 39 B.T.A. 1005; John C. Scully, 44 B.T.A. 1279. We do not read the Supreme Court's decision in Higgins v. Commissioner, 312 U.S. 212, as being contrary to this holding. Therefore, whatever proportion of petitioners' office expenses for 1937 was properly allocable to petitioners' real estate business was deductible. The evidence *89 shows that of the office expenses in question 90 percent were properly allocable to petitioners' real estate business. We, therefore, hold that 90 percent of the expenses in question are deductible as ordinary and necessary business expenses. However, if we are in error in holding that under the facts stated petitioners in the taxable year were carrying on a business of owning, operating, and managing improved real estate, nevertheless we think the expenses in question would still be deductible under section 121 of the Revenue Act of 1942 dealing with "nontrade or non-business deductions". That section reads in part as follows: (a) Deduction for Expenses. - Section 23(a) (relating to deduction for expenses) as amended to read as follows: (a) Expenses. - * * * * *
(2) Non-Trade or Non-Business Expenses. - In the case of an individual, all the ordinary and necessary expenses paid or incurred during the taxable year for the production or collection of income, or for the management, conservation, or maintenance of property held for the production of income. This section also provides: (e) Retroactive Amendment to Prior Revenue Acts. - For the purposes of the Revenue Act of 1938 *90 or any prior revenue Act the amendments made to the Internal Revenue Code by this section sh&ll be effective as if they were a part of such revenue Act on the date of its enactment. Therefore, it is plain that the provisions of section 121 above quoted are applicable to the taxable year involved in these proceedings. It also seems plain that even if we are in error in holding that petitioners were engaged in carrying on a business during the taxable year, that nevertheless the 90 percent of the office expenses which we have allocated to managing and operating the real estate would be deductible under section 121(a)(2), Revenue Act of 1942. We so hold. The testimony shows that 10 percent of the office expenses were properly allocated to the cost of caring for petitioners' securities, such as collecting the income, keeping accounts of these collections, reinvesting the proceeds when a security was sold, and things of that sort. These are not properly classed as business expenses. See Higgins v. Commissioner, supra. While these expenses cannot be allowed as deductions of ordinary and necessary business expenses, nevertheless they are deductible under *91 section 121(a)(2), above quoted, of the Revenue Act of 1942. We so hold. The third and final issue which we have to decide relates only to Docket No. 107313, Barbara S. Kirkland, petitioner, and concerns a claimed farm loss of $1,784.80. The Commissioner, in disallowing the deduction of this alleged loss stated as follows: (d) Your deduction in the amount of $1,784.80 representing a loss on the operation of your farm is disallowed for the reason that you have failed to submit any evidence indicating that it was incurred in any transaction entered into for profit within the meaning of Section 23(e) of the Revenue Act of 1936, as amended. It is unnecessary to cite authorities to show that this determination of the Commissioner is presumptively correct, and the burden of proof of showing to the contrary is on petitioner. Petitioner did not testify at the hearings. She was absent in Florida. Mary Widmayer, the office manager of the petitioners and their brother, testified. She proved the fact of the purchase of the farm in October of 1937 and the purpose of petitioner to establish a dairy farm. She showed by the books that the receipts from the sale of milk in the taxable year were *92 $77.93 and that the farm expenditures, including the loss from the death of a horse, were $1,862.73. The witness, Mary Widmayer, testified, among other things, as follows: She [referring to petitioner Kirkland] had some very good friend named John Ellsworth who maintained a thoroughbred Jersy herd of cows. They sold their milk and farm products at a shop on Lexington Avenue. Mrs. Kirkland thought, after many conversations with those people, that she could make some money too, that if she got a good enough herd, established the Folly Farms Company, might also sell her products. She set about looking for a farm to establish a dairy herd, and set herself up in business. Article 22(a)-7, Treasury Regulations 94, relating to gross income of farmers, contains, among other things, the following provision: As herein used the term "farm" embraces the farm in the ordinary accepted sense, and includes stock, dairy, poultry, fruit, and truck farms; * * *. All individuals, partnerships, or coporations that cultivate, operate, or manage farms for gain or profit, either as owners or tenants, are designated as farmers. A person cultivating or operating a farm for recreation or pleasure, the result *93 of which is a continual loss from year to year, is not regarded as a farmer. We think the facts, which have been proved at the hearing in these proceedings, establish that petitioner Kirkland acquired this Indian Hill Farm for the purpose of operating it as a dairy farm for profit and not for recreation or pleasure. She did not acquire the farm until October, 1937. She immediately set about to purchase thoroughbred Jersey stock with which to operate the farm. The milk receipts were very small in 1937 as compared with the expenses of operating the farm but this is explained by the fact that the farm was acquired late in the year and it took some time to assemble the dairy herd. As a consequence the milk production period in 1937 was short. and operated for profit we know of no reason why we should disallow the resulting farm loss even though the expenses were large in proportion to the small milk receipts. We have examined the listed items of expenses incurred in the operation of the farm and none of them appear to be capital expenditures. If we are correct in our finding that the farm was acquired The loss claimed because of the death of a horse is listed at $300 on the books of *94 petitioner. The testimony of the witness Mary Widmayer as to the death of this horse was as follows: She bought that horse at the same time she bought the farm. She bought a very fine team of horses, $550 or $600 from the man who was running the place at the time she purchased it. The horse got into barbed wire and got tetanus and died within a few days, * * *. This being the only evidence as to the cost of the horse, we can allow petitioner for the loss of the horse no more than one-half of $550. The claimed farm loss of $1,748.80 should, therefore be reduced $25by. With this adjustment made in the amount of the claimed loss, we sustain petitioner as to this issue. Cf. Israel O. Blake, 38 B.T.A. 1457. Our decision that petitioner Kirkland operated this dairy farm in 1937 for profit is not res judicata of that question for any subsequent year. Louis E. Stoddard, Jr., 47 B.T.A. 584. In Docket No. 107313 decision will be entered under Rule 50. In Docket No. 107314 decision will be entered for petitioner.